| | | |
|---|---|---|
| CHARTER OAK | ) | |
| FIRE INSURANCE COMPANY, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-03451-JMS-MPB |
| | ) | |
| FSSI, INC., | ) | |
| | ) | |
| *Defendant*. | ) | |

## ORDER

In this subrogation action, Plaintiff Charter Oak Fire Insurance Company ("Charter Oak") filed a Complaint against FSSI, Inc. ("FSSI") related to an insurance payment Charter Oak made for water damage done to inventory (including clothing and accessories) when a sprinkler cap in a warehouse's sprinkler system malfunctioned (the "Incident"). [Filing No. 1.] On April 5, 2019, Charter Oak filed a Motion in Limine, which is ripe for consideration. For the reasons set forth herein, the Court **GRANTS IN PART** Charter Oak's motion.

## I.
### BACKGROUND

The following undisputed facts are taken from the Complaint, [Filing No. 1], the Deposition Transcript of Kent Crawmer, [Filing No. 70-1], and the Deposition Transcript of Scott Scholl, [Filing No. 71-1].

### A. Parties Involved

Plaintiff Charter Oak is a licensed insurer that provided an insurance policy to Fortna, Inc. ("Fortna"). [Filing No. 1 at 1.] Fortna was hired by OHL/Geodis to install a material handling system in a building housing inventory in Plainfield, Indiana. [Filing No. 1 at 2.] Fortna contracted

with FSSI to have FSSI complete a portion of the installation—specifically, to install a "20 level pick module expansion sprinkler." [Filing No. 1 at 3.] In the agreement between Fortna and FSSI, FSSI agreed to "indemnify, defend, and hold Fortna harmless from and against all demands, claims, suits, and expenses for personal injury, property damage, or otherwise arising out of an alleged defect in the goods or services, the breach of this Agreement, or from third-party claims." [Filing No. 1-3 at 2.]

### B. The Incident

On January 13, 2016, FSSI was completing its portion of the sprinkler system installation when a cap on the sprinkler system "was dislodged," allowing water to stream into the warehouse, which "caus[ed] extensive damage to the OHL/Geodis premises" and to the inventory. [Filing No. 1 at 3.] It is the parties' understanding that the sprinkler cap became dislodged due to a coupling coming apart (the "Coupling"). [Filing No. 70-1 at 26-27.] (A coupling is a metal part used to join two pieces of pipe together, as shown below).

1 2

Under its insurance policy with Fortna, Charter Oak was obligated to pay for the damage to the inventory. [Filing No. 1 at 3.] In this subrogation action, Charter Oak is seeking reimbursement

---

[1] Victaulic, "Grooved Technology," https://www.victaulic.com/grooved-technology/.

[2] Victaulic, "Style 357 Installation-Ready™ Rigid Coupling For CPVC/PVC Pipe," https://www.victaulic.com/products/style-357-installation-ready-rigid-coupling/.

of $106,823.98 from FSSI to recover for the amount Charter Oak paid. [Filing No. 1 at 3.] Charter Oak alleges that FSSI "was negligent and/or breached the applicable standard of workmanship in its operation causing the dislodgement of a sprinkler head." [Filing No. 1 at 3.]

### C. Kent Crawmer's Testimony

Kent Crawmer—FSSI's president and part-owner—examined the Coupling and the portion of the sprinkler system near the site of the Incident. [Filing No. 70-1 at 18; Filing No. 70-1 at 21.] Mr. Crawmer took pictures of the Coupling during his examination. [Filing No. 70-1 at 21.] The day after the Incident, Mr. Crawmer wrote a letter to his contact at Fortna providing a summary of what happened and his opinion of what may have caused the Incident. [Filing No. 70-1 at 20; Filing No. 70-2.]. Mr. Crawmer wrote,

> There is really only two reasons why a grooved coupling would come off – either it wasn't tight or there was a part failure. The part stayed together for well over an hour so I would doubt that the tightening of it was an issue – usually if this is the issue, it's because the coupling wasn't tightened at all.

[Filing No. 70-2 at 1.] Mr. Crawmer advised that FSSI "would have to send [the Coupling] back to the manufacturer to have it analyzed." [Filing No. 70-2 at 1.] However, FSSI never sent the Coupling back to the manufacturer. [Filing No. 70-1 at 28.]

In his deposition, Mr. Crawmer, who has an engineering degree from Purdue University, testified about his belief that the Coupling had been sufficiently tightened. [*See* Filing No. 70-1 at 56-60.] Mr. Crawmer based this opinion on his "experience in the field," his examination of the Coupling in person, and his review of the photographs he took of the Coupling at the time of his examination. [Filing No. 70-1 at 57.] During the deposition, Mr. Crawmer reviewed the photographs of the Coupling and stated the photographs showed "that the part had been tight, that the coupling had been tight on the part. And that's why those - - the parts of the coupling had dug

into the part of the fitting. So that - - I concluded at that point that the part was tight." [Filing No. 70-1 at 57.][3] Mr. Crawmer reviewed a photograph of a separate coupling that was the same type as the subject Coupling, and he testified that the "paint's worn off where the - - where the tooth would have been, where it would have dug into the fitting," which shows that the coupling was tightened. [Filing No. 70-1 at 58.] Mr. Crawmer circled on the photographs locations where he saw "teeth mark[s]" and "shiny metal from after the paint's been worn off" from the tightening. [Filing No. 70-1 at 58-59.] The photographs used during the deposition are not attached to the Amended Notice of Filing of Deposition Transcript of Kent Crawmer filed by Charter Oak, [Filing No. 70], nor to any of the parties' briefs, [*see* Filing No. 65; Filing No. 68; Filing No. 72], so the Court has not seen the referenced photographs.

When asked if he expected to testify as an expert about the cause of the Incident, Mr. Crawmer stated that he could give his opinion as to the cause but that his opinion "would not be considered an expert opinion at that point. Just drawing a conclusion from basically experience in the field." [Filing No. 70-1 at 56-57.]

### D. Missing Coupling

After the Incident, the Coupling was kept in FSSI's shop at one point in time, [Filing No. 70-1 at 28], as well as kept in the work van of FSSI foreman Scott Scholl "for weeks, if not months," [Filing No. 71-1 at 26]. However, the Coupling was later lost or misplaced. [Filing No. 70-1 at 30 (Mr. Crawmer testifying, "I cannot find [the parts] at this point. . . . I can only guess [what happened to them]. But we've - - that was two-and-a-half years ago, and we've moved twice

---

[3] In his deposition, Scott Scholl—the FSSI foreman overseeing the project—similarly described the "teeth marks" that are shown in the photographs: "[T]hose are just little indents on the coupling. . . . That is where the little rivets from the coupling would compress down onto the fitting. . . . These little teeth on the coupling would leave that little impression on the fitting." [Filing No. 71-1 at 43.]

since then. So my guess is that it might - - that they've been misplaced in the shuffle. There was never a chain of custody established.").] When asked if he was aware at the time of the Incident that FSSI may potentially be considered responsible for the damage, Mr. Crawmer testified:

> A.    I - - I would have guessed at that time that it would have been some kind of an insurance claim, yes, on somebody's part, yes.
>
> Q.    So at that point were - - you would have been aware that you should - - it would be important for you to hold on to those parts; is that correct?
>
> A.    I would have guessed that at that time, yes.
>
> Q.    And what's the reason then that the parts were not held on to?
>
> A.    I don't have a good reason. Like I said, we - - we moved - - we usually have apprentices doing the moving for us, moving from one shop to the other. And I'm going to guess that it - - the parts got lost in the shuffle. We have a lot of different parts and pieces in the shop. So - -
>
> Q.    To your knowledge were the parts ever marked in a fashion to indicate that they should not be disposed of?
>
> A.    I don't recall.

[Filing No. 70-1 at 32-33.]

Mr. Scholl testified, "[Mr. Crawmer] wanted me to hold onto [the Coupling]. And I don't know what happened to it. . . . And I don't know if I just tossed it or lost it." [Filing No. 71-1 at 26.] Mr. Scholl confirmed that the Coupling was not tagged or marked in any way to indicate that it was to be preserved, and it was placed in Mr. Scholl's van "in a spot . . . where old fittings go." [Filing No. 71-1 at 27.] The van where the Coupling was held was "from time to time" accessed by other FSSI apprentices who would "get things out of it" and "bring tools in and out." [Filing No. 71-1 at 28.]

The extent of FSSI's investigation into where the Coupling could be was Mr. Crawmer asking Mr. Scholl "if he had it in his possession, in his service van. But [he did] not and could not remember having it in his van." [Filing No. 70-1 at 30.]

**E.  Charter Oak's Motion**

Charter Oak retained an expert to analyze the evidence in this matter and determine the potential cause of the Incident. [Filing No. 65 at 2.] Charter Oak's expert concluded "[t]he most likely cause of the subject incident is the failure to tighten the components installed by FSSI." [Filing No. 65-2 at 3.] However, the expert noted, "In the absence of the parts, it [cannot] be determined if there were any defective conditions present in the components that may have contributed to the leak." [Filing No. 65-2 at 3.] Charter Oak argues that its expert "is unable to test the conclusion [of Mr. Crawmer] or independently evaluate the basis of [Mr. Crawmer's] opinion." [Filing No. 65 at 2.] Consequently, Charter Oak filed the pending motion seeking a finding that FSSI spoliated the Coupling and seeking sanctions including: (1) the exclusion of Mr. Crawmer's opinion regarding the Coupling being properly tightened; and, (2) "an inference that had FSSI been able to produce the coupling, it would have evidenced that it was not properly tightened prior to the failure." [Filing No. 65 at 3-4.] That motion is ripe for the Court's decision.

**II.**
**DISCUSSION**

Charter Oak argues that "[a]dmission of Mr. Crawmer's opinion would unfairly prejudice [Charter Oak] since [Charter Oak] does not have the opportunity to inspect and test the coupling." [Filing No. 65 at 3.] Charter Oak argues that FSSI's actions satisfy the elements of spoliation because FSSI had a duty to preserve the Coupling—evidenced by Mr. Crawmer's admission that FSSI was aware of the potential for litigation following the Incident—and because FSSI

subsequently lost the Coupling.  [Filing No. 65 at 3.]  Consequently, argues Charter Oak, FSSI should be sanctioned for its spoliation.  [Filing No. 65 at 3.]

In response, FSSI argues that "[a]llowing Mr. Crawmer to testify that the coupling was properly tightened is not unfairly prejudicial because his testimony has probative value and will not induce the jury to decide the case on an emotional basis."  [Filing No. 68 at 2.]  FSSI further argues that Mr. Crawmer's testimony was not based solely on his personal observation of the Coupling, but also on the photographs he took of the Coupling, which he viewed during the deposition and which are available to Charter Oak's expert to review.  [Filing No. 68 at 3.]  FSSI also argues that Charter Oak's request for a jury instruction at this stage of litigation is premature because Charter Oak's expert has not been deposed yet.  [Filing No. 68 at 4.]  Moreover, argues FSSI, the special jury instruction that Charter Oak requests is not appropriate because FSSI did not intentionally destroy the Coupling in bad faith.  [Filing No. 68 at 4.]  Finally, FSSI argues that it did not have a duty to preserve the Coupling back in 2016 (when, it appears, the Coupling was lost) because FSSI did not know that Charter Oak planned to file a lawsuit against FSSI—especially because Charter Oak did not initiate this litigation until September 28, 2017.  [Filing No. 68 at 6.]

In reply, Charter Oak argues that it will be "massively" prejudiced if Mr. Crawmer is permitted to "to opine on the core liability question at issue in this case while [Charter Oak's] own expert is deprived of the opportunity to evaluate that opinion. . . ."  [Filing No. 72 at 1.]  Charter Oak argues that its expert will not be able to examine the "bite marks" on the Coupling, which Mr. Crawmer was able to do.  [Filing No. 72 at 2.]  Charter Oak argues that FSSI recklessly or intentionally disposed of the Coupling despite Mr. Crawmer's acknowledgment that there would likely "be some kind of insurance claim."  [Filing No. 72 at 2.]  Charter Oak also argues that Mr.

Crawmer sent inaccurate information to Fortna to evade liability for the incident, as well as "deliberate[ly] mishandle[ed]" the Coupling, which shows that FSSI's actions were in bad faith. [Filing No. 72 at 3.]

Although Charter Oak styles its motion as a Motion in Limine, the relief Charter Oak seeks is a finding of spoliation and an order for sanctions. [Filing No. 65 at 3-4.] Therefore, the Court will treat Charter Oak's motion as such.

It is well established that under the Erie doctrine, "federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). The parties generally agree that courts in the Seventh Circuit apply state law, rather than federal law, regarding spoliation in diversity of citizenship cases.[4] *Bonilla v. Rexon Indus. Corp.*, 2015 WL 10792026, at *10 (S.D. Ind. Aug. 19, 2015). Because this case involves diversity of citizenship, the Court shall apply Indiana state law related to spoliation. "Spoliation

---

[4] The Court acknowledges FSSI's argument that because Charter Oak "emphasizes evidentiary issues throughout the Motion in Limine," the subject matter of the motion is "plac[ed] . . . within the realm of federal law." [Filing No. 68 at 5.] But the authority on which FSSI relies to support this argument is from the Sixth Circuit, not the Seventh Circuit. [Filing No. 68 at 5.] In *Aspen Am. Ins. Co. v. Interstate Warehousing, Inc.*, a party similarly relied on Sixth Circuit authority, which "held that spoliation sanctions are governed by federal law." 372 F.Supp.3d 709, 727 (N.D. Ind. 2019). However, because the case was filed in Indiana and was subject to diversity jurisdiction, the court applied Indiana law regarding spoliation. *Id.* ("Aspen correctly represents the Sixth Circuit's holding in *Adkins*, but its application of Sixth Circuit law to the issue of spoliation is likely in error and Indiana law would apply in this case."). Courts in the Seventh Circuit have consistently applied state law regarding spoliation in diversity of citizenship cases. *See Allstate Ins. Co. v. Sunbeam*, 53 F.3d 804, 806 (7th Cir. 1995) ("Generally, in a diversity case, state law governs issues that potentially alter the outcome of a case"); *see also Napier v. Louis Dreyfus Co.*, 2018 WL 5016336, at *4 (N.D. Ind. Oct. 15, 2018) ("The case before me is a diversity of citizenship case, so state and not federal law governs the issue of spoliation"); *Bonilla v. Rexon Indus. Corp.*, 2015 WL 10792026, at *10 (S.D. Ind. Aug. 19, 2015) (courts in the Seventh Circuit shall "apply the respective state law principles regarding spoliation" when there is diversity of citizenship); *ArcelorMittal Ind. Harbor LLC v. Amex Nooter, LLC*, 2018 WL 509890, at *1 (N.D. Ind. Jan. 23, 2018) ("duty to preserve pre-suit evidence is governed by Indiana state law, not federal law").

is a particular discovery abuse that involves the intentional or negligent destruction, mutilation, alteration, or concealment of physical evidence." *Popovich v. Ind. Dep't of State Revenue*, 17 N.E.3d 405, 410 (Ind. T.C. 2014). "The party raising a claim of spoliation bears the burden of proving that 1) there was a duty to preserve the evidence, and 2) the alleged spoliator either negligently or intentionally destroyed, mutilated, altered, or concealed the evidence." *Id.* (citing *Glotzbach v. Froman*, 854 N.E.2d 337, 338-39 (Ind. 2006)). "Mere ownership of potential evidence, even with knowledge of its relevance to litigation, does not suffice to establish a duty to maintain such evidence." *Glotzbach*, 854 N.E.2d at 341. "If proved, spoliation may be used to establish that the evidence was unfavorable to the party responsible." *Cahoon v. Cummings*, 734 N.E.2d 535, 545 (Ind. 2000) (internal quotation marks and citations omitted). "[C]ourts have found a spoliation sanction to be proper only where a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent." *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008); *see also Am. Nat. Prop. and Cas. Co. v. Wilmoth*, 893 N.E.2d 1068, 1071-73 (Ind. Ct. App. 2008) (holding that a party owed no duty to preserve evidence where it "had no notice of a pending lawsuit at the time of the alleged spoliation," and where the item disposed of "had no foreseeable evidentiary values and could not have been expected to be a focus of the litigation") (internal quotation marks and citations omitted).

The Court must first consider whether Charter Oak has shown that FSSI had a duty to preserve the Coupling. *See Popovich*, 17 N.E.3d at 410. Fundamental to this consideration is whether FSSI "knew, or should have known, that litigation was imminent." *Trask-Morton*, 534 F.3d at 681. Here, it is clear that FSSI's principal, Mr. Crawmer, was aware of the prospect of an insurance claim (i.e., potential litigation) as early as the day immediately following the Incident. [Filing No. 70-1 at 32-33.] Mr. Crawmer admitted as much, and then testified that he "would have

guessed that" it was important for him to hold onto the subject parts "at that time." [Filing No. 70-1 at 32.] The awareness of FSSI's principal of the need to preserve the Coupling is similar to that of Aqua Environmental Container Corporation's ("Aqua") property manager in *N. Ind. Pub. Serv. Co. v. Aqua Envtl. Container Corp.*, 102 N.E.3d 290 (Ind. Ct. App. 2018). In *N. Ind. Pub. Serv. Co.*, a fire occurred in Aqua's warehouse and the fire chief told Aqua's property manager that "he suspected the fire originated in the furnace area." *Id.* at 301. The fire marshal then "pointed out the furnace to [the property manager] and told him that [Aqua] needed to preserve it." *Id.* However, several parts of the furnace were inadvertently not retained following the demolition of the burned part of the building. *Id.* at 294-95. The appellate court found that Aqua's duty to preserve the furnace "arose at or near the time of the fire," because "[Aqua] knew, or at the very least, should have known that litigation was possible, if not probable. Indeed, the timeline of events indicates that Aqua was aware of the need, if not its duty, to preserve the furnace because [the property manager] repeatedly instructed [the demolition company] during the demolition process to preserve the entire furnace." *Id.* at 301. Similarly, FSSI was aware of the possibility of imminent litigation here, and therefore the Court finds that FSSI had a duty to preserve the Coupling.

Next, the Court must consider whether FSSI "either negligently or intentionally destroyed . . . or concealed" the Coupling. *Popovich*, 17 N.E.3d at 410 (citing *Glotzbach v. Froman*, 854 N.E.2d 337, 338-39 (Ind. 2006)). Charter Oak has not presented evidence demonstrating that FSSI intentionally disposed of the part; however, there is sufficient evidence showing that FSSI was negligent in its handling of the Coupling. *See N. Ind. Pub. Serv. Co.*, 102 N.E.3d 290, 302 (finding that negligent spoliation occurred where Aqua conceded that "apparently inadvertently, some of the furnace components were not saved"). Despite Mr. Crawmer acknowledging that it was

important to hold onto the Coupling, the part was placed in FSSI's shop and/or in a foreman's work van without being marked or tagged in any way that would indicate the part should not be reused or disposed of. [Filing No. 70-1 at 28; Filing No. 71-1 at 26-27.] The Coupling was stored in a location where other "old fittings go" and where several FSSI apprentices were "bring[ing] tools in and out," [Filing No. 71-1 at 27-28], making it possible for an apprentice to inadvertently remove the Coupling without FSSI's knowledge. It is easy to imagine several steps that FSSI could have taken to ensure that the Coupling was preserved for this litigation. However, FSSI failed to take any such precautions, and its mishandling of the Coupling constitutes negligent spoliation.

That said, the sanctions Charter Oak seeks for FSSI's negligent spoliation are more severe than necessary under the circumstances presented in this case. Had the parties not had any photographs of the Coupling and had Mr. Crawmer's testimony been entirely based on his personal observation of the Coupling, the sanctions Charter Oak has requested may have been appropriate. However, the majority of Mr. Crawmer's testimony regarding the "teeth marks" on the Coupling indicating that the Coupling was tightened was based on his review of the photographs of the Coupling presented during his deposition. [Filing No. 70-1 at 57-59.] Those same photographs are available to Charter Oak's expert for him to review and analyze. The Court finds that the appropriate remedy for FSSI's negligent spoliation is to limit Mr. Crawmer's opinions to those that are based on the photographs presented in his deposition.

### III.
### CONCLUSION

The Court finds that: (1) FSSI had a duty to preserve the Coupling; and, (2) FSSI's misplacement of the Coupling amounts to negligent spoliation. Accordingly, the Court **GRANTS IN PART** Charter Oak's Motion in Limine, [65], to the extent that Kent Crawmer's testimony at

trial as to his opinion of the cause of the Incident must be limited to his opinions based on the photographs of the Coupling and the surrounding area of the sprinkler system presented at his deposition. No opinion based on Mr. Crawmer's personal inspection of the Coupling will be permitted.

Date: 7/24/2019

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**